\*HUNTER v. GOUDY AND OTHERS. [449

*Relief in Equity.*

Contracts made in good faith can not be rescinded in equity where both parties were mistaken as to value.

THIS case came up from Greene county. The object of the bill was to obtain relief against a judgment at law on certain sealed notes made in 1816.

The bill charged that on the 2d of May, 1816, J. Hunter agreed to purchase of Ekellis Willhite five lots in the town of Pittsburg, in the then territory of Indiana. That Willhite represented that he, with David Hillis and John Minor, were proprietors of the town, which was represented to be in a flourishing condition, and likely to become a seat of justice. That for the purchase money, he gave five notes payable in September following, for $355; three made payable to Ekellis Willhite, and two to his son, John H. Willhite. At the same time he received Ekellis Willhite five title bonds in the following terms:

"We, Ekellis Willhite, John Minor, and David Hillis, obligate

ourselves and our heirs, to deed to John Hunter one in-lot in the town of Pittsburg, Indiana Territory, as known on the plan of said town, as of record, by the No. 47, for lot aforesaid; for the performance of which obligation we jointly and severally bind ourselves under the penal sum of $2,000, current money of the United States. Given under our hands and seals, this 2d day of May, 1816.

"EKELLIS WILLHITE, [Seal.]
JOHN MINOR,          [Seal.]
DAVID HILLIS,        [Seal.]"

This contract was executed for all the parties by Willhite, who represented that he was authorized to do so by Minor and Hillis.

The bill further charges that Willhite's representations in relation to the town were false. That he had no power from Minor and Hillis to sell or to bind them in a bond; that the land on which the town was laid out was not secured, being only entered and one payment made to the government; that Thomas Hunter was not an original party to the contract, but executed the notes as security, after they became due, without any consideration; that after the notes became due they were assigned for a trifling consideration, and came to the hands of the Goudys by assignment, 450] *dated in February, 1818, by whom judgment had been obtained against Thomas Goudy alone for the full amount of the notes. The bill prays an injunction and a rescission of the contract.

The answers admit the contracts, assignments, and judgment, as stated in the bill; but they deny the allegations of fraud and misrepresentation. Willhite asserts that Minor and Hillis were equally interested with him, and that he had power from them to sell and execute bonds; that they had a title to the lands which had not been forfeited, but was now secure; that John Hunter saw the town before he purchased, and that no misrepresentations were made.

The testimony on the part of the complainants proves that the town of Pittsburg is entirely abandoned as a town; that Willhite has inclosed the whole site as a farm, and has it under cultivation. It is also proved that Willhite had made but one payment on the land in 1816. But that the whole was paid before the time of hearing this cause, and Willhite entitled to a final certificate.

On the part of the defendants, it was proved that Minor and

Hillis were understood to be part proprietors of the town, and one witness testifies that he understood from them that they had authorized Willhite to sell lots. It was also proved that Minor and Hillis were men in good circumstances, sufficient to be responsible for the title to the land. And it was in proof that Hunter expressed himself well pleased with the bargain.

A deed for the lots from Willhite, Minor, and Hillis, duly executed and acknowledged, dated 12th March, 1823, was made an exhibit in the case.

COLLET, for complainant; ALEXANDER, for defendant.

By the COURT:

The misrepresentation charged in the bill is not made out in proof, although it is plain that the complainants have made a hard and losing bargin. The lots appear to have been purchased upon speculation under the impression that a town would grow up and property be valuable. The purchaser was on the ground and could judge for himself. He seems to have had the same opportunity to form a correct opinion that was possessed by the other party. A court *of equity never interferes to relieve against a con- [451 tract, made in good faith, where both parties are mistaken as to the value. Had any circumstance given a great and sudden rise to lots in this town, the proprietors could not have asked equity to give them a new bargain against Hunter by increasing the price he was to pay. It was an equal risk, and equity can not interpose.

By procuring Thomas Hunter to execute the notes as security after they became due, John Hunter then affirmed the contract, and acknowledged its continued obligation, although not performed by the other party making a conveyance. To make the state of the title a ground for rescinding the contract, the purchasers should have tendered payment of the purchase money and demanded a title; or if the tender was not necessary in this case, he should have claimed his deed, or have taken some steps avowing an intention to give up the bargain. He has not shown that he was ignorant of the state of the title when he purchased, and we are not to presume it.

457

Judge BURNET's dissenting opinion :

I will state, as concisely as practicable, the reasons which have induced me to dissent from the opinion of the court in this case.

1. The notes, or sealed bills, having been assigned long after they were due, are subject to the same equity in the hands of the assignee, as if they had remained in the hands of the original payee.

2. From the terms of the contract, the delivery of the deed, and the payment of the money, were, to say the least, simultaneous acts, and the vendor had no right to demand the money till he had offered the deed.

3. There was a suppression of the truth by Willhite.

4. There was also a suggestion of falsehood.

5. The disparity between the value of the lots and the price to be paid is so enormous that it would, under the circumstances of the case, be inequitable to hold the purchaser to his bargain.

6. The object of the purchase has failed in consequence of the improper conduct of the vendor.

7. There has been gross laches on the part of Willhite. He has 452] trifled with his contract till the circumstances of *the parties and the value of the property are materially changed.

1. It is unnecessary to discuss the first ground, as the fact appears from the bill and answer, and the legal consequence is not denied.

2. By the tenor of the bonds, Hunter was entitled to a deed on demand. The notes were payable at a future day. It must, therefore, have been the understanding of the parties that the conveyance was to precede the payment of the money, or at least to accompany it ; and if the whole contract had been embraced in one instrument, the conveyance would have been a condition precedent, and the tender of a deed must have preceded the commencement of a suit. The circumstances that obligations were given for the purchase money, distinct from the title bonds, ought not, in a court of equity, to affect the construction of the contract, which should be considered as an entire transaction, in order to give effect to the manifest intention of the parties. There is nothing disclosed in the case from which an inference can be drawn that Hunter intended to rely on the faith of Willhite, or to part from his money before he received his title. In latter years

courts of law, as well as courts of equity, have strongly inclined to consider the stipulations of contracts as dependent, and when a fair interpretation of the whole transaction would warrant it, they have so declared them.   The principle is both just and equitable. While its tendency is to secure both parties, it does injustice to neither.   Men may contract as they will; they may give credit at pleasure, but here no such intention appears.   The situation of the property, at the time of the contract, was such that Hunter could not safely have parted with his money.   Only a small part of the purchase money had been paid to government, and by the terms of their sale the entire tract might have been forfeited for the non-payment of the residue.   It was prudent, therefore, on his part to make his contract so as to guard against that danger.   In the case of Hutchinson v. McNutt, 1 Ohio, 14, this doctrine was recognized.

3. It was the duty of Willhite to communicate to Hunter the real situation of the title, and the time when it would be in his power to execute the deed.   But it is not pretended by the defendants that this information was given, and *the only in-   [453 ference that can be drawn from the bill, answer, and exhibits is, that the deed was expected when the notes became due, and that Hunter had no reason to doubt of its being then executed.   Every person, when he enters into a contract, has an object in view, to attain which punctuality is necessary; if that be wanting, his arrangements, predicated on the contract, may be frustrated.   This applies to every contract, and imposes it as a duty on a vendor to disclose the nature of his title.   Such a disclosure was not made in this case, and the consequences of suppressing the truth are very apparent.   Had the vendor been informed that the purchase money had not been paid to government; that the land was subject to be forfeited, and that the title would not be perfected for more than six years, he might have made his calculations accordingly, and would most certainly have declined the contract.   We find, on the part of the defendants, a disposition, even at this time, to cover the gross negligence which has occurred in the completion of the title.   This appears from the silence of the answers · on this point, and the caution manifested in taking the deposition of the register of the land office.   No question was proposed to him tending to disclose the time of paying the money, or of assigning the certificate to Willhite, nor was he required to annex

to his deposition copies of the receipt and assignment filed in his office, or of the final certificate issued thereon, although he was required partially to testify of their contents.

4. Willhite affirmed that Minor and Hillis were joint proprietors in the town, and that he was legally empowered by them to sell and to affix their names and seals to the title bonds, and although this authority is expressly denied in the bill, no power of attorney is produced or proved. An attempt, however, is made to remedy this defect of power, by procuring them to join in executing a deed nearly seven years after the vendee had a right to demand his title. Although the defendant, Willhite, attempted to bind his co-proprietors, and to render them liable to an action, should there be a failure of title; yet it appears they were not to participate in the fruits of the contract, as their names were erased from the notes after they were drawn, by which three of them were made payable to Willhite himself, *and the other two to his son. This circumstance shows, that Willhite was acting for his own individual benefit. If it be asked why Hillis and Minor joined in the deed, the answer is at hand. Hillis had previously assigned all his interest in the land to Wlilhite—Minor sets up no claim to any part of it—the patent had just been procured in the name of Willhite— the title was perfect—they run no risk, therefore, by joining in the deed. They appear to be friends of Willhite, and disposed to aid him as far as it can be done without risk or loss to themselves; but I discover no admission of a liability on their part, or any disposition to interfere till Willhite had possessed himself of the entire interest and title in the land, by some arrangement, not disclosed, with his co-proprietors and the assignee of the notes. Then we find their signature, to the deed as mere matter of form. I use this expression because they had no interest in the land, either equitable or legal. Had this arrangement been made in time, it would not have rested with Hunter to object; he would have had the benefit of his contract, and could not have complained; but as the defects of the title were not disclosed at the time of the contract, nor remedied within any reasonable time thereafter, it has operated as a fraud on Hunter, which ought to release him from the obligation of the contract.

5. The great disparity between the value of the lots, and the sum stipulated to be paid, is also a circumstance worthy of notice. I am aware that this consideration, of itself, has been held not suf-

ficient to set aside a contract, though it might induce a chancellor to refuse a decree for a specific performance; but when this disparity is connected with the other facts of the case, it will be entitled to great weight. Whatever might have been the supposed value of the lots at the time of the contract, in the estimation of a person ignorant of the defect of title, or whatever might have been the real value at that time, if the vendor had been possessed of a legal title, in which the community could have confided, it is very apparent that at the time the title was perfected, and Willhite was enabled to fulfill his contract, they were of no more value than an equal quantity of wild land of the same quality, in any part of the neighborhood. As this state of things is to be ascribed to the failure and *abandonment of the town, which has resulted [455 from the conduct of Willhite, it is proper to consider the present value of the lots as the consideration of the notes. If this be correct, the court requires Hunter to receive a property worth four or five dollars, and to pay for it a sum exceeding five hundred dollars. It was not in the power of Willhite to perform his contract till the prospect of a town was lost sight of, and the lots reduced, in the public estimation, to their present value; it is, therefore, just to consider that value as the consideration to whatever cause its diminution may be ascribed; for until the title was perfected, the purchaser could not safely improve or dispose of the property, or apply it to any valuable use. Under such circumstances, to compel him to pay at the rate of a hundred for one, seems to be inconsistent with equity, and the common dictates of justice. The disparity is so enormous as to shock the mind, and impress it at once with a conviction of fraud.

6. The object which might have induced Hunter to make the purchase has wholly failed, and this is to be attributed to the conduct of Willhite, in neglecting to perfect his title, and in converting the site of the town into a farm. The former circumstance would create such doubt and suspicion, as would deter adventurers from risking their money, by purchasing and improving in the town, and the latter was a virtual withdrawal of the lots from the market. It must have diverted the attention of the public from the place, and they must have ceased to consider it as a town. This conduct, having removed every inducement to the purchase and improvement of lots, until after the season for establishing a town had entirely passed by, has rendered it impossible for

461

Hunter to use the lots for the purpose intended. His object, therefore, has been lost. The consideration moving him to the purchase has failed, and that failure appears, in no degree, to be ascribable to himself. The proprietors, having laid out their town, and induced the complainant to purchase, were under a moral obligation to use reasonable diligence to advance its prosperity. Purchasers would naturally rely, and had a right to rely on such efforts, and the withholding of them, was a breach of an implied undertaking, injurious to those who might have previously purchased. But in 456] this case, Willhite is not only *chargeable with an omission of duty, but with acts directly calculated to destroy the town, or rather to prevent it from coming into existence, for it does not appear that it ever has existed, otherwise than on paper. It appears, from the testimony, that Hunter immediately after his purchase, engaged men to improve his lots; that he intended to settle on them, and commence a business that could be carried on with advantage only in a town, but discovering that the title was doubtful, and the fate of the town thereby uncertain, and that no efforts were making to advance it, he could not proceed with safety, and the event has proved that his apprehensions were well founded.

7. Willhite has been guilty of gross laches, as will appear by reference to dates. The contract was made in May, 1816. The notes became payable in September following, when, if not before, Willhite was bound to convey the lots. The payment to government for the quarter section, on which the lots are situate, was not made until October, 1821. The last payment to government became due in August, 1819. In August, 1820, the land became liable to forfeiture, and was saved by the act of Congress, 1821. The deed to Hunter was not executed until March, 1823, more than six years after the time it should have been made, by the terms of the contract. These laches have not been acquiesced in, nor are they satisfactorily accounted for. In the meantime, the situation of the parties, and of the property, is materially changed. The contemplated town is converted into a farm. The purchaser, unable to procure a title, has abandoned the object, and has settled himself in the State of Ohio. The value of the lots has been reduced to the legal price of government land, and when separated from the farm of Willhite, of which they seem to form a part, are in reality of no value. Under such circumstances, it appears

Hunter v. Goudy and others.

to me that the complainant ought to be relieved from the contract.

The facts disclosed in the case do not appear to establish the grounds on which the opinion of the court is predicated. The lots were purchased by complainant for his own use. It was his intention to improve and settle on them, not to speculate, by selling them at an advanced price. Nor do I *discover anything [457 in the pleadings, or testimony, that will justify the inference that Hunter had the same opportunity to form a correct opinion that was possessed by the other party.

Willhite knew the standing of his title—the money due on the land to the government, and his ability and arrangements to complete the payment. He does not pretend that he disclosed these facts to Hunter, nor is there any evidence to show that Hunter had reason to suspect that the purchase money had not been paid to government, or that Willhite's title was not complete.

If this contract had been made in good faith, both parties being ignorant of the value, the case would have presented itself to my mind in a different aspect, but it appears to me, that on the part of Willhite, the contract was made, *mala fide*, and that the depreciation of value has arisen from the want of title, not disclosed, but since discovered, and from the conduct of Willhite himself, subsequent to the contract, of which Hunter could have no knowledge. Equity does not usually require anything to be done *pro forma*, when the doing of it would be vain and useless. The complainant had discovered that Willhite had no title, and that he could not execute a deed. It was altogether uncertain whether he would ever acquire a title. It was therefore natural for Hunter to draw the conclusion, that in the estimation of both parties the contract was at an end. Under such circumstances, to require a formal tender of the purchase money, or a demand of a deed, to put the vendor in the wrong, seems to be, to say the least of it, *herens in cortice*.

It is true that the complainant has not expressly proved a negative, as to his want of knowledge of the state of the title, but he has solemnly averred it under oath in his bill, and the defendants have not attempted to deny it in their answers, or to disprove it by testimony. I can not, therefore, concur in the opinion expressed by the court.